UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GARY W. PRIESSNITZ,

                Plaintiff,

      v.                                   Case No. 17-C-372

NANCY A. BERRYHILL,

                Defendant.

## DECISION AND ORDER

This is an action for judicial review of a decision by the Commissioner of Social Security. Plaintiff Gary Priessnitz challenges the decision of the Commissioner denying his application for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act. He claims that the ALJ erred in denying his application and the decision is not supported by substantial evidence. Specifically, he argues that the Administrative Law Judge (ALJ) articulated a Residual Functional Capacity (RFC) that was not supported by substantial evidence and that the ALJ gave insufficient weight to his subjective symptoms. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

On July 24, 2014, Priessnitz filed an application for Social Security Disability Insurance Benefits, alleging an onset date of August 1, 2008, due to dyslexia, bulging discs in his back, and a pinched nerve. R. 221–22, 248. Because of a final decision denying an earlier application for the period ending January 28, 2011, Priessnitz later amended his onset date to January 29, 2011, at which time he was 49 years old. R. 113, 139. And because he was last insured under the Social

Security disability program on December 31, 2013, he was not eligible for DIB unless his disability arose prior to that time. R. 139, 147. Thus, to prevail, Priessnitz had to show he was disabled or had become disabled during the almost three-year period between January 29, 2011, and December 31, 2013.

Based on the review of the record by the doctors and disability specialists at the state agency, Priessnitz' July 24, 2014 application was initially denied on November 5, 2014. R. 162. Priessnitz sought reconsideration, and his application was again denied on May 12, 2015. R. 166. Priessnitz requested a hearing, and on August 29, 2016, a hearing was held before ALJ Jeffry Gauthier. R. 35. Both Priessnitz, who was represented by counsel, and a vocational expert (VE) testified at the hearing. R. 36.

At the hearing, Priessnitz testified that prior to his alleged onset date he worked for many years in the paper industry, where he set up and operated machines as a slitter, a laminator, and a rewinder. R. 46–50. He claims he became disabled when he was hit by a car while driving his motorcycle and injured his right shoulder in 2008. R. 53. Priessnitz testified that he has had chronic shoulder pain since that time despite two surgeries on the shoulder in the year after the accident. R. 54–55. Other than the two surgeries and physical therapy, Priessnitz denied he has received any other treatment for his shoulder, and was currently taking only over-the-counter medication for pain. R. 57. He stated that he continued to exercise his shoulder to keep it limber, but it has grown weaker over time with decreased muscle mass. R. 58.

Priessnitz testified that problems with his neck and back also prevented him from working. R. 59. He said a doctor told him he had arthritis in his neck, but could not recall when. R. 59. He had surgery on his back but wasn't sure what was done. R. 59–60. He also said he had injections

in his back within the past year. R. 60–61. Though he had been having problems with his back for several years prior to 2014, Priessnitz testified that he did not see a doctor for his back and neck until 2014, because he doesn't like doctors and put it off until he couldn't stand the pain. R. 61. He also used a cane which he said a doctor had prescribed for him five or six years ago and which he used to attend every doctor's appointment or whenever he had to walk from a parking lot to wherever he was going. R. 62.

When asked to describe a typical day during the relevant time period, Priessnitz responded "my life is hell." R. 63. He testified that he was unable to throw a football or a frisbee, or even to stand up for a typical shower. He was unable to walk around the block. R. 64. On a typical day, Priessnitz testified that he would get up at 5:00 a.m., have a cup of coffee, go outside, and sit on the porch if it's a nice day, and then watch TV and fall asleep on the couch. If he felt able, he would walk out to his garage and organize his tools. Then he would go back to the house and lie on the couch, talk to his kids when they got home from school, and fix them dinner. R. 65.

In response to further questioning by his attorney, Priessnitz testified that he was unable to raise his arms above shoulder level without excruciating pain. R. 69. He also testified he had difficulty opening jars, dressing himself, and washing his hair. Every day, his neck pain would reach a 10 on a 10-point scale at least once for fifteen minutes to an hour, regardless of what activity he undertook. R. 70–71. He testified he was unable to look up and felt dizzy when he looked down. R. 71–72. He said he could stand for about 20 minutes if he had something to lean against, otherwise only 15 minutes, but then had to lie down for about 10 minutes. R. 75–77.

On the other hand, Priessnitz also testified that he went camping with his family twice a year and rides a Honda 70 motorcycle in order to get around the campgrounds. R. 79–80. He also

3

testified that in May of 2015, he fractured his right elbow when he tripped over the trailer and fell while waxing one of his two wave runner personal water crafts. R. 82–83. Finally, Priessnitz acknowledged that when he had his back surgery in July 2014, he told the doctor that he had been having problems for about two years but was functioning fairly well until 3 to 4 months earlier when the pain became worse and finally unbearable in the last 2 to 3 months. R. 81.

In an eleven page decision dated November 2, 2016, the ALJ determined that Priessnitz was not disabled during the relevant time period. R. 148. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ concluded that Priessnitz had not engaged in substantial gainful activity between January 29, 2011, the alleged onset date, and December 31, 2013, his date last insured. R. 141. At step two, the ALJ concluded that Priessnitz had three severe impairments during the period of time under review: disorder of the spine, status post-right shoulder surgeries, and obesity. *Id.* At step three, the ALJ concluded that none of Priessnitz' severe impairments met or medically equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 142. Specifically, the ALJ considered listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine), as well as Social Security Ruling 02-1p, which requires the ALJ to account for obesity throughout the sequential evaluation process, including when reviewing the listings during step three. *Id.*

Before proceeding to step four, the ALJ assessed Priessnitz' RFC and determined that he has the ability to perform light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "no climbing of ladders, ropes or scaffolds; no more than frequent overhead reaching with the upper extremities bilaterally; and an allowance to be off task less that 10% of the time in an

4

8-hour workday in addition to normal breaks." R. 143. The ALJ dedicated four and a half pages to explaining the basis for this RFC determination. R. 143–47. In particular, the ALJ assigned great weight to the RFC opinions of state agency medical consultants Dr. Mina Khorshidi and Dr. Benhamin Cortijo, and he explained his bases for discounting Priessnitz' subjective reports regarding his symptoms of pain. R. 145–47.

At step four, the ALJ determined that Priessnitz, based on his RFC, is not capable of performing his past relevant work. R. 147. But based on the testimony of the VE at the hearing, the ALJ then concluded at step five that Priessnitz is capable of performing other jobs that exist in significant numbers in the national economy. R. 147. Specifically, the ALJ noted the VE's testimony that Priessnitz is capable of performing work as a deli worker, counter attendant, and marker/labeler. R. 148. Accordingly, the ALJ concluded that Priessnitz was not disabled between his amended alleged onset date of January 29, 2011, and December 31, 2013, his date last insured. R. 148.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 404 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Priessnitz contends that the ALJ's formulation of the RFC suffered from four errors: (1) the RFC limitation for his upper extremities was not supported by substantial evidence; (2) the ALJ did not adequately consider the combined impact of his obesity with his back and leg pain, as well as medical evidence from after his last insured date; (3) there is not substantial evidence to support the ALJ's conclusion that he would not be off task more than 10% of the workday; and (4) the ALJ did not properly consider his subjective symptoms of pain. Each of these arguments will be addressed, but not in the order Priessnitz presents them. Key to the ALJ's RFC finding was his assessment of Priessnitz' subjective complaints of pain. In fact, Priessnitz' entire argument that the ALJ erred in determining his RFC assumes his statements about his pain and disability were for the most part true. The ALJ found, however, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 144. In other words, using the more familiar terminology that the SSA used prior to March 28, 2016, the ALJ found that Priessnitz' statements were not credible. Since

6

Priessnitz' argument that the ALJ erred in determining his RFC is based in large part on the symptoms he alleged, it makes no sense to address the ALJ's RFC finding until we first determine whether the ALJ erred in assessing the credibility of those statements. It is there that I therefore begin.

## A. Subjective Symptoms of Pain

Priessnitz argues that the ALJ's analysis of his statements concerning his subjective symptoms was legally insufficient. ECF No. 12 at 20–26. He notes that the ALJ found that his statements were "not entirely consistent with the medical and other evidence in the record for the reasons explained in this decision." *Id.* at 20 (citing R. 144). Priessnitz then continues: "To the extent that indicates the ALJ's belief that a claimant's subjective complaints can only be accepted if 'entirely consistent' with the evidence, that is legal error. The ALJ must apply a preponderance standard, not a clear and convincing, or beyond a reasonable doubt, standard of review." *Id.* (citing HALLEX I-3-3-4; 20 C.F.R. § 404.901; 20 C.F.R. § 404.953(a)). Priessnitz then proceeds to argue that the evidence cited by the ALJ as inconsistent with his complaints of severe and disabling pain could conceivably be reconciled with those complaints. That is not the test, however.

The Social Security regulations distinguish between symptoms, signs, and laboratory findings. 20 C.F.R. § 404.1529. Symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, are the claimant's own description of his impairments. *Id.* §§ 404.1529(a)–(b). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms)." *Id.* § 404.1529(b). Signs are shown by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques such as chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests. *Id.* § 404.1528(c).

The regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms—his subjective complaints—allegedly caused by his impairments. *See* 20 C.F.R. § 404.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity for work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.*

Until recently, the evaluation of the claimant's statements concerning his symptoms, once it was determined that his medically determinable impairments could reasonably be expected to cause the alleged symptoms, was viewed by the SSA as a credibility determination. *See* SSR 96-7p, rescinded and superceded by SSR 16-3p (effective March 27, 2016, and republished October 25, 2017). In adopting SSR 16-3p, the SSA eliminated the use of the term "credibility" from its sub-regulatory policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2 (Oct. 25, 2017). Under SSR 16-3p, the question the SSA asks now is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.* at *2. But this change in terminology was not intended to change the substance of the ruling. The types of evidence and other factors that are considered in assessing the claimant's statements are the same. Whether or not the SSA chooses to use the word "credibility," statements by the claimant concerning the intensity, persistence, and limiting effects of

8

his or her impairments that are inconsistent with the medical and other evidence in the record need not be accepted by the ALJ in reaching a decision. In the words of the SSA's new ruling:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2017 WL 5180304, at * 8.

In any event, a court's review of a credibility, or consistency, determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, reviewing courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted). The ALJ more than met that standard here.

Priessnitz filed his first application for social security disability benefits on January 23, 2009, about four months after his accident. R. 98. The ALJ noted that he underwent a right shoulder arthroscopy with limited debridement of the labrum, subacromial decompression with ligament release, and distal clavicle excision in November 2008. Follow-up x-rays showed that the glenohumeral joint was unremarkable and stable. Soft tissues were free of any masses or

calcifications. In January 2009, Priessnitz underwent a second right shoulder arthroscopy this time with limited synovectomy and debridement of the labrum. He continued to complain of pain in his right shoulder in February and March of 2009, but he declined multiple conservative treatment options that were presented to him. R. 144 (citing R. 98–105).

The ALJ noted that the next medical record that addresses Priessnitz' shoulder problem is almost two years later in February 2011, shortly after his amended alleged onset date, and his shoulder problem was not even the primary complaint. R. 144 (citing R. 421–22). Priessnitz reported to Dr. Stephen Cruz that he was having left gluteal pain that goes down the posterior aspect of his left leg down to his ankle. He also reported at that time that his right shoulder pain had never gone away. The ALJ noted that examination of the right shoulder revealed active range of motion on the right side, but Priessnitz, at least at first, would not let Dr. Cruz put him through passive range of motion at that time. Dr. Cruz noted that Priessnitz had intact deep tendon reflexes (DTRs) at triceps, biceps, and brachial radialis. He demonstrated "great grip strength and appeared to have good strength with flexion/extension of the biceps and triceps in abduction and adduction of the shoulder." R. 144. X-rays revealed an appropriate acromioplasty and distal clavicle excision. The glenohumeral joint was well reduced, and no other bony or soft tissue abnormalities were observed. Priessnitz showed active range of motion as limited to 90 degrees of both forward flexion and abduction secondary to pain. Passively, Dr. Cruz noted he was able to flex Priessnitz to 100 degrees and abduct to 120 degrees at which time he stopped secondary to discomfort. Dr. Cruz noted that strength testing was weak initially, but upon further questioning Priessnitz was able to hold his arms against resisted external rotation at +5/5 on the left and +4/5 on the right secondary to pain. He noted +4/5 muscle strength of supraspinatus testing, again with much encouragement and seemingly

limited by discomfort. Dr. Cruz noted positive Neer and Hawkins impingement signs and negative crossover. R. 145 (citing R. 421).

The ALJ noted that Dr. Cruz offered Priessnitz conservative treatment as well as a second opinion appointment relative to his shoulder complaints, but he declined, just as he had in March and April of 2009. There was no other treatment sought or received for shoulder issues prior to the date last insured, almost three years later. *Id.* In addition, the ALJ noted that Priessnitz had not alleged shoulder problems as a condition limiting his ability to work in his 2014 Disability Report. *Id.* (citing R. 248). The ALJ concluded that "the absence of ongoing complaints or treatment, together with his unwillingness to pursue proffered treatment options, suggest that his shoulder symptoms were not as serious as claimed during this relevant period under consideration."

Priessnitz argues that the gap in treatment for his shoulder may be explainable by reasons other than the absence of serious problems: "Although a gap in treatment may signify that a claimant's symptoms are not as severe as [he] allege[s], it also may be due to other reasons, such as an inability to pay for treatment, frustration with lack of improvement with treatment, treatment options, or course of treatment, or a claimant may have been able to reduce or structure [his] activities so as to attenuate [his] symptoms." ECF No. 21 at 10. But if the pain and disability was as severe as Priessnitz claimed, it is not unreasonable to conclude that he would have taken his doctor up on other treatment options or at least sought a second opinion as his doctor also suggested. The fact that he continued to seek treatment for cough, sore throat, and skin rash over the same period as the gap in treatment for his shoulder occurred suggests inability to pay was not the reason. It is also hard to understand why, if it was as disabling as he claimed, he would have failed to list his

shoulder problem as one of the physical impairments on his Disability Report. Instead, he listed dyslexia for which he offered no medical evidence.

Regarding the back pain complaints, the ALJ noted that, during the February 2011 visit with Dr. Cruz, Priessnitz indicated he was on some sort of disability and was seeking "some sort of note so as to get an extension of the disability." R. 145. Although he complained of left gluteal pain extending to his leg, the ALJ noted he complained of no back pain and no areas of tenderness throughout the mid-back or left lower lumbar or gluteal regions. Straight leg raising tests were negative bilaterally; DTRs were intact at both ankles and knees with no motor or sensory deficits in either lower extremity. Priessnitz was able to walk up on toes and heels and do a half squat without any problems. His hips showed good internal and external rotation with full range of motion.

Despite the absence of significant physical findings, Dr. Cruz prescribed physical therapy, and at a May 2011 follow-up visit, Priessnitz reported marked improvement and was no longer in pain. The ALJ noted there was no evidence of further treatment sought or received thereafter for spinal complaints until March 2014, after the date last insured. At that time Priessnitz reported a 20 year history of back problems but had not tried taking anything for his back pain. *Id.* At a follow-up visit in July 2014, Priessnitz reported that he had been functioning fairly well up until 3 to 4 months ago. The ALJ noted that Priessnitz acknowledged at the hearing that Dr. Cruz' entry was accurate and, contrary to his testimony that he had required a cane to ambulate for the past 5 to 6 years, that he had been able to walk around the block unassisted into 2014. R. 146. In fact, the ALJ noted that there was no indication in the medical records during the relevant period that Priessnitz either used or needed an assistive device. *Id.*

12

Finally, the ALJ noted that despite his testimony that he was barely ambulatory and spent his days sitting on a couch or organizing his tools if he felt up to it, Priessnitz testified that he goes camping and that he appeared animated at the hearing when talking about riding his motorcycle around the campgrounds. The ALJ observed that the fact that Priessnitz described his motorcycle as a street motorcycle, which would mean driving it would involve shifting gears and no doubt jarring motions, was inconsistent with his reported "dramatic physical symptoms and limitations." *Id.* These activities, considered along with the fact that he injured his right upper extremity in 2015 while waxing his wave runner water craft, suggested a functional ability significantly greater than Priessnitz reported. *Id.* (citing R. 471). The ALJ concluded: "His ability to engage in these activities, together with the lack of significant objective findings and his refusal to engage in proffered conservative care, support the RFC as assessed herein." *Id.*

Contrary to the assumption implicit in Priessnitz' argument, there is no presumption that the statements of claimants seeking disability benefits are true absent conclusive evidence that they are exaggerating their symptoms. It would be a strange (and likely insolvent) system that required that applicants be awarded such valuable benefits whenever an ALJ in a non-adversary proceeding was unable to conclusively refute each subjective complaint of pain and disability a claimant makes. It is the province of the factfinder to weigh the evidence and draw reasonable inferences therefrom. "[S]ubstantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion, such that where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). When the ALJ follows the correct procedure and it is not patently wrong, his credibility assessment will not be disturbed.

The ALJ did that here. The analysis the ALJ provided is more than sufficient to support his assessment of Priessnitz' subjective complaints. The ALJ provided specific reasons, well supported by the record, to explain why he concluded that Priessnitz' statements describing his symptoms were inconsistent with the medical and other evidence and thus not credible. Based upon this analysis, the ALJ was justified in giving little weight to Priessnitz' statements about his subjective symptoms in determining his RFC.

## B. RFC Limitations for Upper Extremities

As noted, Priessnitz takes issue with the ALJ's RFC finding concluding that he is capable of performing light work but with no more than frequent overhead reaching with the upper extremities bilaterally. R. 143. Specifically, Priessnitz argues that there was not sufficient evidence in the record to support the RFC limitation identified by the ALJ, which he contends does not adequately account for the limitations on his arm movement.

The ALJ expressly afforded great weight to the opinions of state agency physicians Dr. Khorshidi and Dr. Cortijo. R. 146. Dr. Khorshidi reviewed Priessnitz' medical records at the initial level in October 2014. R. 123–24. Concluding that Priessnitz does experience some exertional limitations, Dr. Khorshidi rated him as capable of lifting and carrying up to 20 pounds occasionally (meaning no more than 1/3 of the time during an 8-hour day) and 10 pounds frequently (more than 1/3 but less than 2/3 of the time during an 8-hour day). R. 121. She also found that he is capable of standing and walking for approximately 6 hours during an 8-hour day. *Id.* Although Dr. Khorshidi acknowledged Priessnitz' chronic shoulder pain following the 2008 motorcycle accident, she also pointed to treatment notes from March 14, 2011, and April 6, 2011, which showed that he declined repeated referrals for conservative pain management at that time. R. 122, 416–19. The treatment

14

notes that Dr. Khorshidi relied upon also show that, despite his claims of pain, Priessnitz resisted external rotation in his left shoulder at +5/5 and in his right shoulder at +4/5 and that he tested at +4/5 muscle strength of supraspinatus. R. 122, 419. On reconsideration in April 2015, Dr. Cortijo affirmed Dr. Khorshidi's opinions regarding Priessnitz' exertional limitations. R. 131–32.

The opinions of Dr. Khorshidi and Dr. Cortijo provide substantial evidence in support of the ALJ's RFC finding. As defined in 20 C.F.R. § 404.1567(b), light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Both doctors expressly found that Priessnitz is capable of carrying up to 10 pounds frequently, meaning their opinions provide direct support for the ALJ's RFC determination. Neither imposed any limitation on overhead reaching. Moreover, the exertional limitations the doctors found or did not find rely on underlying treatment notes created during the period of time for which Priessnitz seeks coverage, adding further support to the ALJ's decision to assign great weight to them. Critically, Dr. Khorshidi's opinion affirmed by Dr. Cortijo was the only medical opinion evidence in the record regarding Priessnitz' RFC. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) ("[B]ecause Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to the [vocational expert]."). In the absence of alternative medical evidence regarding Priessnitz' exertional limitations, the ALJ reasonably relied on the opinions of Dr. Khorshidi and Dr. Cortijo as substantial evidence of his RFC.

Priessnitz offers a curious argument that the ALJ's limitation to "no more than frequent overhead reaching with the upper extremities bilaterally" is not supported by substantial evidence, since both Drs. Khorshidi and Cortijo did not include any limitation on his overhead reaching. The ALJ explained that he included this and other additional limitations "[i]n order to afford every

15

reasonable consideration to [Priessnitz'] subjective complaints and his obesity." R. 146–47. In other words, notwithstanding his finding that Priessnitz' statements concerning his pain and severe limitations were not credible, or in the current SSA terminology, consistent with the medical and other evidence, the ALJ did not reject them entirely. Priessnitz testified at the hearing that he struggles to lift his arm above his shoulder and experiences significant pain when he does so. R. 68–70. Priessnitz argues "it is inconsistent for the ALJ to indicate he limited Plaintiff, beyond the state agency doctors' restrictions, based on Plaintiff's reports, but adopt none of Plaintiff's reported limitations." ECF No. 12 at 10.

There is no rule saying that the ALJ must entirely adopt what any one witness says. Given the injury to his shoulder, the ALJ generously limited Priessnitz to frequent overhead reaching, notwithstanding serious doubts as to his credibility. To the extent the ALJ was being overly generous in light of his assessment of Priessnitz' statements, Priessnitz has no reason to complain. He cannot seriously argue he suffered prejudice because the ALJ determined his RFC was more limited than the only doctors who offered opinions thought necessary and than his analysis of the evidence warranted.

The same is true of Priessnitz' complaint about the ALJ's adoption of a 10% off-task limitation. The ALJ included in the RFC "an allowance to be off task less than 10% of the time in an 8-hour workday in addition to normal breaks." R. 143. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. Priessnitz argues that the ALJ pointed to no evidence to support the reason for imposing the off-task limitation. He also notes that no medical provider ever articulated an opinion regarding the amount of time that Priessnitz was likely to be off task due to his pain, and he observes that the ten-

16

percent-off-task limitation seems to arise out of a question to the VE at the hearing. In response to a question from the ALJ, the VE testified that, although employers may allow a person to be off task for approximately 4 to 6 minutes every hour, being off task more than ten percent of the time would be work preclusive. R. 87–89.

As with the limitation on overhead reaching discussed above, Priessnitz misses the thrust of the ALJ's RFC determination, which includes the off-task limitation as another way of giving some weight to Priessnitz' testimony regarding subjective symptoms of pain. The opinions of state agency physicians Dr. Khorshidi and Dr. Cortijo provided substantial evidence for the ALJ's determination that Priessnitz should be limited to an RFC of light work. In articulating the RFC, however, the ALJ "imposed further restrictions" because the ALJ sought "to afford every reasonable consideration to the claimant's subjective complaints and his obesity." R. 146–47. Consequently, the limitations on climbing, on reaching, and for being off task reflect a concern by the ALJ that Priessnitz' testimony and medical records might support greater limitations on his RFC than the light work capacity described by the state agency physicians. To the extent that these additional limitations are not as extensive as Priessnitz would prefer, they also reflect the ALJ's acknowledgement that his testimony as to subjective symptoms of pain was not entirely credible since it was inconsistent with the medical and other evidence in the record.

Priessnitz' argument also seems to challenge the specific percentage of the off-task limitation the ALJ set, assuming the issue is susceptible to a mathematical precision that this kind of limitation does not allow. The ALJ's finding of an off-task limitation of up to 10% of the work day is based on his judgment as to what effect Priessnitz' impairment may have on his ability to work; it is not a specific measurement.

In any event, even if the off-task limitation is not warranted, Priessnitz cannot claim prejudice. As with the limitation on overhead reaching, Priessnitz cannot reasonably argue he was harmed by the ALJ adding a limitation to his RFC that the evidence did not support. A claimant may suffer prejudice when the ALJ errs in failing to include an additional functional limitation that was supported by the evidence—not when he includes a limitation that was not supported by the evidence.

## C. Obesity and More Recent Medical Evidence

Priessnitz also argues that the ALJ's decision is not supported by substantial evidence because it improperly failed to consider the impact of his obesity on his back and leg pain and did not adequately consider relevant evidence from after his last date insured. He argues that the ALJ's analysis regarding his back pain, leg pain, and obesity reflects an improper, selective discussion of the portions of the record that support a finding of non-disability. *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."). He further contends that the ALJ improperly discounted medical evidence from outside of his coverage period. *See Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period.").

Examination of Priessnitz' medical records indicates that the ALJ's decision is not the result of selective reliance on favorable evidence and is instead supported by substantial evidence. Priessnitz' argument relies almost entirely on his own statements and notes from the July 23, 2014 preoperative evaluation conducted by Dr. Stephen Cruz just before the laminectomy and decompression surgery scheduled for July 28, 2014. R. 384. The notes indicate Priessnitz was

18

experiencing lower back pain radiating into his legs and that "[t]his is a problem that has bothered [him] for probably 2 years now, but he was functioning fairly well up until about 3 to 4 months ago when the pain started getting worse and 2 to 3 months ago it became almost unbearable." R. 384. Priessnitz emphasizes the statement indicating that lower back and leg pain had bothered him for two years preceding July 2014, meaning during his coverage period. Yet even crediting this report from after his coverage period, it indicates that pain in his lower back and legs was not so severe during the coverage period as to warrant the pursuit of treatment. Indeed, treatment notes *during* the coverage period are consistent with the notes from July 2014, indicating in May 2011 that physical therapy caused significant improvement in his leg and back pain to the point that "[h]e [was] not actually in pain at [that] time." R. 410. In fact, according to the preoperative surgical evaluation report,

> Prior to his back acting up as bad as it is, [Priessnitz] states he was very active, could go hunting and walk at least a half to 1 mile if not more. He said that his hunting partner complained about him always being active instead of sitting and waiting. Also prior to this pain acting up, he states that he could do a couple of flights of stairs carrying a basket. Now he would be limited to 1 flight of stairs without carrying a basket or walking about a half block. The limiting factor is back pain; he says not shortness of breath or chest pain.

R. 385. This would suggest that Priessnitz was far more active than he suggested after his shoulder injury and again raise questions about his credibility.

It is also worth noting that Priessnitz underwent a laminectomy and decompression surgery on July 28, 2014, seven months after his date last insured and only four days after he filed his second application for DIB, to address the pain in his back. R. 384. Although he continued to complain of lower back pain three months after the surgery, his doctor was unable to determine the cause. R. 485. On examination, the only unusual finding was some mild diffuse tenderness on palpation in his

19

lower back around the incision with a decreased range of motion on flexion-extension rotation. Straight leg raising was negative, and neurologic testing was normal as to gait, upper and lower extremity strength, muscle tone, and sensory examination. *Id.* X-rays also revealed "no convincing abnormal motion on flexion-extension," and no subluxations were noted. *Id.* Given the absence of physical findings supporting his complaints and the ALJ's assessment of his allegations of pain, it was not unreasonable for the ALJ to give little weight to his post surgery medical records as evidence of his pre-surgery condition.

The ALJ also appropriately considered Priessnitz' obesity as part of his evaluation. Recently, the Seventh Circuit determined that an ALJ properly considered a claimant's obesity where the ALJ "identified [the claimant's] obesity as a severe impairment and thoroughly discussed its functionally limiting effects throughout the decision." *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). That is precisely what happened here. The ALJ identified obesity as one of Priessnitz' severe impairments, and the analysis then discusses Priessnitz' weight to an extent proportional to its presence in his medical records. R. 141–42, 146. Weaving the discussion of Priessnitz' obesity into the discussion of his back and leg pain, the ALJ found "no medical evidence of complaints by the claimant or specific recommendations from medical providers relative to his weight." R. 146. As Priessnitz notes, the medical records do contain references to his weight, such as notes from two May 2011 appointments noting that he was "morbidly obese" and "planning on trying to walk to get his weight under control." R. 410–12. But those records do nothing to connect the pain in Priessnitz' back and legs to his obesity. Accordingly, there was substantial evidence to support the ALJ's handling of Priessnitz' obesity.

Lastly, Priessnitz argues that the ALJ erred in failing to discuss his significant work history. ECF No. 21 at 14. He notes that the Seventh Circuit has indicated that a good work history offers support to a claimant's reported limitations because it demonstrates a willingness to work and supports the conclusion that the claimant would do so if able. ECF No. 12 at 26 (citing *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016)).

A major premise to this argument, namely, that Priessnitz had a good work history, is questionable to say the least. Although Priessnitz may have had a good work history prior to his August 2008 accident when he was 47 years old, he has not worked at all since that time. Although he suffered a serious injury to his shoulder at that time, he was expected to transition back to his old job within two months of his first surgery. R. 453. He has been seeking DIB since January 2009. R. 445. His previous attempt to obtain DIB was denied for the period extending through January 28, 2011, in a decision he did not appeal. Given this history, the ALJ did not err in failing to view Priessnitz' work history as strong evidence of his claim.

Even apart from this consideration, however, the ALJ did not commit reversible error by failing to explicitly discuss Priessnitz' work history. *See Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history . . . ."). Although a consistent work history weighs in favor of a positive credibility finding, it is still just "one factor among many, and it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016); *see also Summers v. Berryhill*, 864 F.3d 523, 528–29 (7th Cir. 2017). As explained above, the ALJ provided ample support for his assessment of Priessnitz' statements. Explicit consideration of his work history was not required.

**CONCLUSION**

For the reasons given above, the decision of the Commissioner is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** this <u>1st</u> day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
